IN THE UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION


- - - - - - - - - - - - - - - - :
IN RE:                           :
                                 :
ZDRAVKO TALANGA                  : Case No. 8:17-bk-09357-MGW
and DARINA TALANGA               : Chapter 7
                                 :
          Debtor                 :
                                 :
- - - - - - - - - - - - - - - - :


                          U.S. Courthouse
                          801 North Florida Avenue
                          Tampa, Florida 33602
                          Held September 4, 2019


                    <u>TRANSCRIPT OF HEARING</u>

   1-Amended Motion to Approve Compromise of Controversy or
  Settlement Agreement, Related Case and Parties: 8:18-ap-
   00049, Elite Financial Edge, LLC, Elite Car Sales, LLC,
 Elite Car Sales of Clearwater, Inc., Anna Dunedin Realty,
     LLC, Sophia Highland Realty, LLC, Pat Margas, Helen
   Vasiloudes, Panayiotis Vasiloudes, Cygram Heritage, LLP
  and Cygram Holdings, LP and ZDRAVKO TALANGA and DARINA
 TALANGA, filed by David Delrahim on behalf of Joint Debtor
   Darina Talanga, Debtor Zdravko Talanga (Doc. #155).....
          *[FULL NATURE OF PROCEEDINGS CONTINUED ON NEXT PAGE]*



   BEFORE THE HONORABLE MICHAEL G. WILLIAMSON, CHIEF JUDGE
             UNITED STATES BANKRUPTCY JUDGE



       PROCEEDINGS DIGITALLY RECORDED BY COURT PERSONNEL.
         TRANSCRIPT PRODUCED BY TRANSCRIPTION SERVICE
         APPROVED BY ADMINISTRATIVE OFFICE OF U.S. COURTS.
_____

                JOHNSON TRANSCRIPTION SERVICE
                   6532 Thoroughbred Loop
                   Odessa, Florida 33556
                      (813) 920-1466

*[FULL NATURE OF PROCEEDINGS CONTINUED FROM PREVIOUS PAGE]*

.....Corrective Objection to Amended Motion to
Approve Compromise of Controversy or Settlement
Agreement, filed by Samantha L. Dammer on behalf of
Creditor PARC Investment Services Corp. (Doc. #160),
Objection to Motion to Compromise, filed by Allan C.
Watkins on behalf of Trustee Carolyn R. Chaney
Modified on 6/5/2019 (Doc. #161), 2-Report and Notice
of Intention to Sell Property of the Estate. Property
description: Non-exempt business interests in Anna
Dunedin Realty, LLC; Elite Financial Edge, LLC;
double wide storage shed), filed by Trustee Carolyn
R. Chaney (Doc. #167) Objection to Trustee's Notice
of Intention to Sell Property of the Estate, filed by
Samantha L. Dammer on behalf of Creditor PARC
Investment Services Corp. (Doc. #170)

<u>APPEARANCES</u>

For the Debtors                    DAVID S. DELRAHIM, Esquire
Zdravko Talanga                    Englander Fischer, LLP
and Darina Talanga                 721 1st Ave N
                                   St Petersburg, FL 33701-3603
                                   727-898-7210
                                   ddelrahim@eflegal.com


For the Trustee                    ALLAN WATKINS, Esquire
Carolyn Chaney                     Watkins Law Firm, P.A.
(Appearing by phone)               707 N. Franklin Street
                                   Suite 750
                                   Tampa, Florida 33602-4423
                                   813-226-2215
                                   allan@watkinslawfl.com


For Parc Investment                SAMANTHA L. DAMMER, Esq.
Services                           Tampa Law Advocates, P.A.
                                   620 E. Twiggs Street
                                   Suite 110
                                   Tampa, Florida 33602-3938
                                   813-288-0303
                                   sdammer@attysam.com


For Elite Financial                ADAM S. LEVINE, M.D., J.D.
Edge, et al                        FL Legal Advocacy Group
                                   of Tampa Bay
                                   1180 Gulf Blvd., Suite 303
                                   Clearwater Beach, Florida
                                   33767
                                   727-512-1969
                                   aslevine@msn.com


Also Present                       Dr. Vasiloudes
                                   Dennis McElrath
                                   Bradley McElrath

<u>PROCEEDINGS</u>

1

2          (Proceedings commenced at 11:00 a.m.)

3          COURTROOM CLERK:  All rise.  This Honorable Court

4  is again in session.

5          THE COURT:  Please be seated.

6          COURTROOM CLERK:  Case No. 17-9357, the Talanga

7  matter, and we should have Mr. Watkins attending by phone.

8          THE COURT:  Mr. Watkins, do you want to make your

9  appearance?

10          MR. WATKINS:  Yes, Your Honor.  Allan Watkins, on

11  behalf of the Trustee, Carolyn Chaney.

12          THE COURT:  And in the courtroom?

13          MR. DELRAHIM:  Good morning, Your Honor.  David

14  Delrahim from Englander Fischer, on behalf of the Debtors,

15  Zdravko and Darina Talanga.

16          THE COURT:  Okay, thank you.

17          MS. DAMMER:  Good morning again, Your Honor.

18  Samantha Dammer for creditor Parc Investment Services Group,

19  who's present through its officers, Dennis McElrath and

20  Bradley McElrath.

21          THE COURT:  Okay, thank you.

22          Mr. LEVINE:  Good morning, Your Honor.  Adam

23  Levine for Elite Financial Edge, Elite Car Sales of

24  Clearwater, Elite -- or Elite Financial Edge, Elite Car

25  Sales of Clearwater, Inc., Elite Car Sales, Anna Dunedin

1  Realty, Sophia Highland Realty, Panos Vasiloudes, Pat

2  Margas, Helen Vasiloudes and everybody else, and Dr.

3  Vasiloudes is present in the courtroom.

4       THE COURT:  Okay, thank you.  Okay, we're here on

5  a motion to approve a compromise.  The Parc Investments,

6  which I take it is an unsecured secured creditor, has

7  objected on a variety of grounds, and we're here to consider

8  the motion.

9       MR. DELRAHIM:  Yes.  Thank you, Your Honor.

10 There's actually a second motion as well, which is the

11 notice of sale, and there was an objection by Parc and

12 by Mr. Levine's clients as well.

13       The notice of sale includes a sale of assets that

14 the Debtors would use to convey to Mr. Levine's clients as

15 part of the -- as part of the settlement agreement, so it

16 may make sense to see if the sale is approved because then

17 we could utilize those assets as part of the settlement

18 agreement to Mr. Levine, if that --

19       THE COURT:  In other words -- okay, one of the

20 objections that was raised by Ms. Dammer was that this

21 settlement would require the conveyance of property of the

22 bankruptcy estate.  And, yet, I don't believe that the

23 Trustee is a party to the settlement, so I don't know how

24 that can be resolved.  Mr. Watkins?

25       MR. WATKINS:  Your Honor, that's correct.  And for

1  the record, I also filed an objection to the motion to

2  compromise.

3  THE COURT:  Oh, I see.  Yes, you did.  Docket

4  No. 161.  And how can you transfer anything the Debtor has

5  a property interest in under a settlement, given that the

6  Debtors are in a Chapter 7, and the only party with the

7  power to transfer assets in a Chapter 7 is the Trustee?

8  MR. DELRAHIM:  Yes, Your Honor.  The Debtors have

9  the authority to transfer assets in which they own, which

10  would be property that is not property of the estate.  And

11  in this case, there's a notice of sale, the Trustee is

12  selling us the property postpetition, and we will utilize

13  that property to convey to the Plaintiffs.

14  THE COURT:  Okay.  But only property that the

15  Trustee has conveyed to your client?

16  MR. DELRAHIM:  Yes, Your Honor. We are not

17  intending to sell any property that is not -- we're not

18  intending to sell property that is of the estate.

19  THE COURT:  Mr. Watkins, what about that?  Is

20  that --

21  MR. WATKINS:  Your Honor, we filed a report and

22  notice of intent to sell the Debtors' interests in the Anna

23  Dunedin Realty stock and in the Elite Financial Edge stock,

24  and then there was a shed that went with it.

25  The other things that were -- the other items that

1  were attempted to be settled were some potential liability

2  claims against either Mr. Levine or some of his clients.

3  Those can't be settled by the compromise with the Debtor.

4            THE COURT:  Okay.  But part of your objection is

5  that the Debtor forced a transfer interest in Elite and Anna

6  Dunedin and you're --

7            MR. WATKINS:  Yes, sir.

8            THE COURT:  But you're selling those to the

9  Debtor; aren't you?

10           MR. WATKINS:  Well, they can transfer it after the

11 sale is concluded, but we also now have objections to that

12 sale.

13           THE COURT:  Okay.  So in other words, it's your --

14 you would not oppose the settlement if the notice of

15 intention to sell -- or if the sale was approved.  Is

16 that correct or do you --

17           MR. WATKINS:  That's correct, Your Honor.

18           THE COURT:  Okay.  And so I guess we've made a

19 deal with the notice of intention to sell that property back

20 to the Debtors.

21           MR. DELRAHIM:  Yes, Your Honor.

22           THE COURT:  Okay.  Mr. Delrahim, if you want to go

23 ahead and cover that, then?

24           MR. DELRAHIM:  Thank you, Your Honor.  Would Your

25 Honor care for any background of the cases as a whole?

1          THE COURT:  Yes, I would.  I don't have a lot of

2    history with this case, although it's been around for a long

3    time.

4          MR. DELRAHIM:  Yes, Your Honor.  I put together a

5    short timeline because there's a lot of erroneous, or an

6    extra chaff, if you will, on the case.  The pleadings are

7    very long, so I really narrowed it down.

8          THE COURT:  Okay.

9          MR. DELRAHIM:  Your Honor, prior to 2012, the

10   Debtors operated a car dealership, an auto repair shop

11   and an assisted living facility.  In 2012, the Debtors

12   invested in a large run-down assisted living facility that's

13   worth about -- at the time, $925,000, owned by a gentleman

14   named Floyd McKenzie, operated by a company named FloMac

15   (phonetic).

16          They put -- the Debtors put money down on that

17   property and agreed to seller financing, and made monthly

18   payments.  And after that, the Debtors, over the course of

19   two years, had spent in excess -- or approximately $380,000

20   all together on this assisted living facility.

21          Some of that money came from loans through the

22   clients of the -- my colleagues to the left.  And so those

23   loans included loans from Dennis McElrath through his

24   company, Parc Investments, including loans that exceeded

25   18 percent interest, and loans from Dr. Panos Vasiloudes

1   and his entities as well.

2          The loans during that period of time, in 2014,

3   from Mr. Vasiloudes and from 2012 to 2014 from Mr. McElrath

4   included loans for the auto repair shop, the car dealership

5   and the assisted living facilities all together.  The

6   idea was to expand the auto business and to operate these

7   assisted living facilities and repair them.  That was all

8   in the 2014 era.

9          After the renovations took place, and in 2014,

10  FloMac had now hid the contract, or did not provide us a

11  copy of the contract, that the Debtors had signed, and had

12  filed -- the Debtors had filed suit because the -- because

13  FloMac padlocked the assisted living facility that was worth

14  nearly a million dollars, and had put about $400,000 into

15  it.  Padlocked that facility and Mr. Levine represented the

16  Debtors in that case, filing suit against FloMac, and that

17  was really where the downfall of the Debtors started.

18          After that, and spending thousands of dollars on

19  attorneys' fees, and having to cover the high interest on

20  the loans, by 2016 and 2017, Mr. Levine had withdrawn from

21  representation, and all of the house of cards kept -- went

22  crumbling down on the Debtors.

23          In that period of 2014, when that case started up,

24  Mr. Levine had recommended that the Debtors do two things.

25  One is convert debt that they had with Dr. Vasiloudes into

1  equity into the membership interests in which Mr. Levine now

2  represents.  So the Elite entities, which the Debtors owned,

3  was now conveyed to Dr. Vasiloudes in exchange for some of

4  the debt that Dr. Vasiloudes had.

5         Additionally, Dr. Vasiloudes, and through Mr.

6  Levine, had suggested that Dr. -- that the Debtors place a

7  $1.2 million loan on their -- or mortgage on their property

8  and convey that mortgage to Dr. Vasiloudes, representing the

9  approximately $1.2 million of the Hancock Bank loan, that

10 Dr. Vasiloudes personally guaranteed, for the Elite

11 businesses.

12        So now the Elite businesses are encumbered in

13 debt, Dr. Vasiloudes is the guarantor on that debt, the

14 Debtors had guaranteed the debt to Dr. Vasiloudes, and the

15 Debtors are now no longer the majority interest holders or

16 any -- they're now just a minority interest holder in all

17 these entities in 2014.

18        2016 comes along, the Debtors open up a company,

19 along with their daughter, to open up a cafe, called the

20 Adriatic Cafe.

21        In 2017, after Mr. Levine has withdrawn and the

22 Debtors end up with a judgment against them from FloMac,

23 five other lawsuits come out against the Debtors, so just

24 clobbering them with the debts that they owed to everyone,

25 and that causes them, by 2017, November 2017, to file a

1   bankruptcy.

2          In the meantime, the Adriatic Cafe, right before

3   they filed the bankruptcy, was served with an eviction

4   action for nonpayment of debt.  As I said, they ran out of

5   money.  So the cafe ended up getting closed down soon after

6   the bankruptcy was filed, because of nonpayment of rents in

7   the eviction action.

8          Procedurally, what we have is the bankruptcy case

9   and two adversary proceedings, one by Parc Investments and

10  the other by Mr. Levine's clients.  Mr. Levine's clients

11  have filed an action under 523.  They have not filed one

12  under 727 -- or I should say one does not exist right now

13  under 727.  Ms. Dammer's client, the Parc Investment, has a

14  523 and a 727 claim.

15         As part of this procedure, Your Honor, in May of

16  2019, we had mediations.  One mediation was attempted with

17  Ms. Dammer's client and one mediation was attempted with

18  Mr. Levine's clients.  The Levine's clients resulted in

19  a resolution, and no resolution was resulted in with

20  Ms. Dammer's clients, Parc Investments.

21         In substantive portion, Your Honor, the settlement

22  agreement involves a release of the Debtors with a release

23  of the claimants of Parc, a dismissal of the 523, but the

24  big issues that were raised was whether or not the -- we

25  could convey the interests in Elite, which is part of the

1   sale --

2         THE COURT:  Well, the release of the 523 was only

3   the 523 that was brought by Mr. Levine's clients, not Ms.

4   Dammer's clients.

5         MR. DELRAHIM:  That is correct, Your Honor.

6         THE COURT:  Okay.

7         MR. DELRAHIM:  Yes.  So the Debtors would release

8   Mr. Levine as to their postpetition claims.  The Plaintiffs

9   agree to convey the interest in Villa Dunedin Assisted

10  Living Facility to the Debtors, however that entity has no

11  assets.  It's really just to clean up all the entities and

12  separate them so that they have their entities and 100

13  percent, we have our one entity really and 100 percent,

14  even though it has no assets.

15        And the substantive objections were really just

16  two portions.  One was that the Debtors can -- well, it was

17  raised actually -- I won't go further than that, Your Honor,

18  since Mr. Watkins had already addressed his real issue.  And

19  in reality, that's the main gusto of the issue.  The rest of

20  it's kind of chaff.

21        THE COURT:  Okay.  So you're saying that once

22  Mr. Watkins has transferred the interest in the estate

23  assets, that are going to be conveyed by your clients under

24  the settlement agreement, then that moots out any objection

25  about this not being property of the estate.

1          MR. DELRAHIM:  That's correct, Your Honor.

2  Otherwise, there is no property of the estate that the

3  Debtors would be conveying.  Any releases would be the

4  postpetition releases, so there's no other assets that

5  are being conveyed.

6          And any claims that would be remaining pre-

7  petition, we don't have an interest in.  It's the estate's

8  property and they can do with it what they want.

9          THE COURT:  So this doesn't affect any prepetition

10  causes of action?

11          MR. DELRAHIM:  No, Your Honor.

12          THE COURT:  Okay.  Okay.

13          MR. DELRAHIM:  Except to the extent that there's

14  non parties -- there's non-parties, the Talangas' kids were

15  part of the releases, along with Mr. Levine's clients and so

16  forth.  So because they're not Debtors, they can release

17  their own claims, obviously --

18          THE COURT:  Right.

19          MR. DELRAHIM:  -- and that would be prepetition.

20          THE COURT:  Okay.  Ms. Dammer?

21          MS. DAMMER:  Yes, Your Honor.  That's not

22  accurate.  With respect to counsel, the mediation agreement

23  clearly affects the issue of the cause of action against

24  Mr. Levine.  And that is an asset of the estate, and that's

25  an asset of the estate that Mr. Watkins is the only one that

1   can really pursue.  So that portion alone of the mediated

2   settlement agreement cannot go through.  That cannot be

3   approved.

4           Now, with respect to the property, the business

5   interests, that Mr. Watkins is intending to sell, we have a

6   concern with that as well.  The issue is that Anna Dunedin

7   Realty is represented as worthless, that it has no assets

8   yet.  It was discovered recently that there's actually a

9   real estate property that it owns that's been for sale since

10  May, which was never disclosed to the Trustee.

11          When I spoke with the Trustee, he was unaware of

12  it.  And the whole thing, I think we really need to just

13  take a step back on all these transactions and everything

14  that we're trying to convey.

15          I mean, I guess we'll talk about the notice of

16  sale first, but it's -- you know, we're asking -- it seems

17  clear that there's collusion between some of the parties,

18  the Debtors, possibly some of Mr. Levine's clients.  What it

19  seems to me is that the notice of sale is really just a way

20  for the -- you know, for everybody to get to the terms of

21  that mediated settlement agreement without going through the

22  proper channels, without having a hearing on the motion to

23  approve the compromise.

24          And I thought I heard counsel say that there was

25  no 727 action.  I'm pretty sure there was a 727 count in

1   Mr. Levine's adversary action.  So, again, motion to approve

2   a compromise for a 727 does have a higher scrutiny than

3   for --

4           THE COURT:  Well, but I don't think their settling

5   it.  Are you settling your 727 action?

6           MR. DELRAHIM:  Your Honor, there is no 727 action

7   by Mr. Levine under the current pleadings, and Ms. Dammer

8   would not be prejudiced.  She still has a 727 action.

9           THE COURT:  She still has her 727 action?

10          MR. DELRAHIM:  Right.

11          THE COURT:  Okay.

12          MR. DELRAHIM:  And as far as the other portion,

13  Your Honor, as I had mentioned before, there's only

14  postpetition claims that are being released.

15          THE COURT:  Okay.

16          MR. WATKINS:  Your Honor, in terms of the Anna

17  Dunedin Realty interest, there is a mortgage on the property

18  from -- I believe it's Hanover Bank for over a million

19  dollars.  So in terms of any value there, we don't believe

20  there as, and Ms. Dammer's solution is to bid higher rather

21  than object to the sale.

22          MS. DAMMER:  And we would reserve our right to bid

23  higher, however we would think that the Debtor should be

24  disqualified from bidding because this wasn't disclosed.

25          The other thing -- and counsel brought up that the

1   Debtors put a mortgage on the property for 1.2 million.  I

2   need to point out that was about six weeks prior to their

3   filing the bankruptcy.  And they listed Cygram, which is the

4   secured creditor, as an unsecured creditor.

5            There's all sorts of issues here in this case.

6   There's all sorts of things that these Debtors need to be

7   accountable for.  And I think to just allow the sale to go

8   through, without these disclosures having been made, I think

9   we really need to do a step back, I think.

10           THE COURT:  Okay, Mr. Levine.  Can you state who

11  you represent again?

12           MR. LEVINE:  Your Honor, there are a couple of

13  different issues that have not been completely accurate.

14  The first is starting with nondisclosure to the Court and

15  the sale of the property.

16           THE COURT:  I'm sorry, who do you represent again?

17           MR. LEVINE:  On behalf of Elite Financial Edge,

18  Anna Dunedin Realty, Panos Vasiloudes, Helen Vasiloudes, Pat

19  Margas, and the assorted companies between Vasiloudes and

20  the Talangas.

21           THE COURT:  Okay.

22           MR. LEVINE:  The first issue that I'd like to

23  address head-on is any issue of collusion or deception.

24  There was none.  In fact, this Court -- I had to approach

25  this Court in order to sell Anna Dunedin Realty's property,

1   and I did that in Docket No. 118.  And 129 was this Court's

2   order.

3           I needed a motion to say that we were free from

4   stay because the Talangas had not paid rent, paid the

5   mortgage, paid any upkeep.  No one from Elite Holdings had

6   done anything about the property except my clients, so for

7   over a two-year period, my clients made all of the costs and

8   expenses to maintain the property.

9           The issue was, this Court held, that Anna Dunedin

10  Realty was not necessarily part of the estate and that we

11  could sell it.

12          So there was no collusion, there was no surprise.

13  I attended that hearing, Your Honor was here, Mr. Delrahim

14  was here at that point.  Ms. Dammer was physically present.

15  I don't recall whether or not Mr. Watkins was present.  But

16  everybody knew about the sale of Anna Dunedin Realty because

17  it was part of an emergency motion that I filed, initially

18  incorrectly, and then correctly following that.

19          That was the subject of this Court's hearing where

20  Anna Dunedin Real -- where this Court held that Anna Dunedin

21  Realty was free from the stay, the automatic stay and the

22  bankruptcy, that I could evict the tenant and that we could

23  sell the property.  And at the time that we were trying to

24  sell it, we had what we thought was a bona fide buyer in

25  May.  Unfortunately that sale fell through.

1          There is still a mortgage on that property.  The

2     Talangas and the petitioners, through their company, have

3     made no payments, have made no support, and have done

4     nothing for that property since before this bankruptcy

5     was initiated.

6          Mr. Delrahim was kind of not correct in his

7     representations to the Court about the history of the

8     Talangas.  The things that immediately stand out from

9     what he said was that the Talangas -- that I represented the

10    Talangas when they started their first lawsuit with FloMac.

11    That is actually not the case.

12         A different attorney started that lawsuit, a

13    different attorney filed that lawsuit.  There was in fact --

14    there's a home here in Clearwater called the Taylor home

15    that the Talangas thought they would turn into an assisted

16    living facility.

17         They bought it from Floyd and Ruby McKenzie

18    through their various companies.  They legitimately spent a

19    lot of money fixing that property up.  The McKenzies then

20    locked them out and threw them out of that property.  They

21    had a different attorney who filed suit.  Unfortunately,

22    that attorney chose to file suit without the benefit of a

23    mortgage or a lease.

24         In the course of that suit, the lease that was

25    filed with that suit that the Talangas signed was a lease.

1 It wasn't a lease to own, it wasn't a mortgage, it wasn't

2 any creative deed exchange. It was a simple lease. The

3 Talangas violated that lease and lost that lawsuit and that

4 resulted in an $800-900,000 judgment. That's why.

5 I withdrew from that case, Your Honor, and as part

6 of what we also addressed in this court, whether or not

7 there was a conflict, because if Your Honor will recall, we

8 addressed in this court that the Talangas did actually sign

9 a retainer agreement with me that said there was a conflict

10 with Dr. Vasiloudes and his companies and that released me

11 from it, and when the Dr. Vasiloudes companies filed suit

12 against the Talangas and we reached a settlement agreement

13 in that suit, where they agreed to owing Dr. Vasiloudes

14 $1.6 million, Helen Vasiloudes, I think, $38,000, and Pat

15 Margas $58,000. In that settlement agreement, it was very

16 clear that I could represent the business entities against

17 the Talangas again for any violation of that agreement.

18 We filed suit in State Court about that agreement,

19 then they filed bankruptcy. When the Talangas filed

20 bankruptcy in that case, the settlement agreement was not

21 set aside. The terms of that settlement agreement have

22 never been set aside. And in the terms of that settlement

23 agreement that's been filed with the court, I think now

24 several times -- I filed it as at least one or two exhibits.

25 I think the Trustee's filed it as an exhibit. I think Mr.

1   Dalrahim's predecessor has filed it as an exhibit with the

2   court.

3          But in that case, that settlement agreement

4   clearly states that all assets from all related companies,

5   Elite Financial Edge, Elite Car Sales of Clearwater, Elite

6   Car Sales, Anna Dunedin Realty, Sophia Highland Realty, and

7   Villa Anna's Living Facility at the time, all company sales

8   would go towards paying off a $2 million bank loan that was

9   outstanding with Hancock Bank.  Any proceeds from any

10   company would do that.

11          Since before that settlement was signed in June

12   of, I think, 2016 or 2017 -- 2017.  Since that was signed --

13   because it was signed in the same year the bankruptcy was

14   filed, so it was in 2017 -- since that was signed, my

15   clients have done their best to honor the terms of that

16   agreement.  The Talangas have made no payments whatsoever.

17   They've made no payments towards any of the business

18   entities.

19          In the case that we're talking about now, and the

20   reason that we objected to the sale of the -- of some of

21   the estate assets, our first argument is Elite Holdings is

22   really part of the estate through the Talangas' actual

23   interest in it.

24          At no time in the 341 hearings, at no time in

25   any discovery that's taken place, at no time in any of the

1    questioning of the Talangas has anyone ever ascertained the

2    actual operative agreement for Elite Holdings.  Nobody knows

3    who is allowed to vote.

4         We do know that Elite Holdings is owned 60 percent

5    by Darina and Zdravko, the petitioners and 40 percent by

6    their children so -- but we don't know who has voting and

7    controlling interest in Elite Holdings.  We know who owns

8    the majority of shares.  We also know that Elite Holdings

9    owns part of the assets of the estate, not the Talangas.

10   Elite Holdings is not party to this proceeding whatsoever.

11        As far as -- that's for Elite Holdings.  For Anna

12   Dunedin Realty, that property is not owned directly by the

13   petitioners.  It's owned by, in part, a 49 percent part, by

14   Elite Holdings, so -- and that money that's -- for any sale

15   is already pledged somewhere else pre-bankruptcy filing.

16        The objection that we have to the sale of some of

17   the estate assets are -- as part of the settlement -- as

18   part of the mediated agreement -- we mediated all day in

19   good faith.  They mediated not only to release any claims

20   against me and my law firm; they also agreed to release any

21   and all claims against Cygram, which is one of the members

22   of the various companies.

23        And what the Trustee is now failing to -- if the

24   Trustee had said to the Talangas, "I'll sell you everything

25   necessary so that you can mediate and be done with this,"

1   then you would have also sold the interests against me and

2   my law firm and against Cygram.  But for some reason that

3   we're not clear on, the Trustee elected to sell an interest

4   in Elite Holdings and their shares and in Anna Dunedin

5   Realty, also something that they don't own directly, they

6   own through Elite Holdings.

7          So there's no reason to actually sell any part of

8   Elite -- Anna Dunedin Realty because that's actually owned

9   by Elite Holdings.

10         Back in January of 2018, when the 341 hearings --

11  several of them occurred -- I provided the Trustee, the

12  Talangas and the original attorney, Ms. Dammer, the U.S.

13  Attorney, and everyone involved, with a thumb drive with

14  thousands of pages of documents for all of the appropriate

15  operating agreements.

16         I also, for every single hearing that we had,

17  offered to provide access to the bookkeeper for all the

18  companies, to explain the thousands of pages of documents.

19  That offer was never accepted, was never taken up on.  No

20  one has ever inquired, from anywhere, about any of the

21  companies or any of the companies' financial assets or

22  wellbeing.

23         The Trustee, the Talangas, no other party has

24  ever done anything to support or maintain any of the other

25  business entities.  The business entities did their best to

1   manage themselves and to run and to pay their debts as they

2   go.  There's still an outstanding $2 million bank loan to

3   Hancock Bank.  And any proceeds that come into the companies

4   has been going to pay for that.

5           So at this point, the Elite Financial Edge, Anna

6   Dunedin Realty, Dr. Vasiloudes and his wife, Pat Margas,

7   object to the sale of some, but not all, of what's necessary

8   to achieve the mediated agreement between the parties,

9   primarily because that mediated agreement also releases

10  the Talangas children and Elite Holdings from any liability

11  to them.

12          This Court may or may not remember that in

13  addition to having to get a relief from stay for Anna

14  Dunedin Realty, the Trustee and Mr. Dalrahim's predecessor

15  made me come to Court so that I would be able to get a

16  relief from stay to sue the Debtors' children because they

17  too are individual guarantors on the agreement from June

18  of 2017.

19          And this Court properly held, I believe, that they

20  weren't party to the bankruptcy, and the bankruptcy didn't

21  extend to them.  The Trustee and Mr. Dalrahim's predecessor

22  argued that it extended to all the nonparties.

23          So in the mediated agreement, we sought to resolve

24  all claims between everyone forever by including the

25  Debtors' children in that mediation.

1          So at this point, we believe it's completely

2    unfair to set aside the actual terms of the mediated

3    settlement that took all day to accomplish.  We believe --

4    we're willing to go with that claim by the letter of what it

5    states in there.  We would not object if the Trustee sold to

6    the Debtors anything necessary to achieve that goal.  But

7    only selling part of that, we would object to, and we would

8    offer to buy that at an auction if necessary.

9          THE COURT:  Okay.  Mr. Watkins, do you have

10   anything?

11         MR. WATKINS:  Your Honor, the Trustee believes

12   there's value in some of the claims against both Mr.

13   Levine's firm and his clients.  We are looking into it.

14         We were not party to the mediation, nor do we

15   intend to be.  That was to settle a 523 action, and somehow

16   the Debtor and Mr. Levine conceived this journey into the

17   unknown of using estate assets to compromise claims that the

18   estate has against them.

19         THE COURT:  Okay.  Do you object to that?

20         MR. WATKINS:  Object to -- I'm sorry?

21         THE COURT:  Are you objecting to it?  I thought

22   you were facilitating this to settle it?

23         MR. WATKINS:  No.  The Trustee was not party to

24   the mediation.

25         THE COURT:  Well, I know, and that's why I'm

1    asking you if you object to it.

2          MR. WATKINS:  I don't object to it.  I want to

3    clarify that any postpetition claims still remain in the

4    estate.

5          THE COURT:  Okay.  I think Mr. Delrahim would

6    agree with that.  But as to the matters raised by Mr.

7    Levine, are you comfortable with the Court approving the

8    settlement and also the sale -- both of which have been

9    objected to.  But I want to hear the Trustee's position.

10         MR. WATKINS:  I have no objection to you approving

11   the sale and I have no objection to approving the motion to

12   compromise, as long as it's made clear that the compromise

13   does not encompass claims that the bankruptcy Trustee may

14   have.

15         MS. DAMMER:  Your Honor, may --

16         MR. DELRAHIM:  Your Honor, we'd be happy to put

17   that in the order as well, Your Honor.

18         MS. DAMMER:  Your Honor, may I?

19         THE COURT:  Yes, Ms. Dammer.  You've been quietly

20   silent there while other parties have had an opportunity to

21   be heard.

22         MS. DAMMER:  Paragraph 6 of the mediated

23   settlement agreement, which was perfectly drafted by Mr.

24   Roy Kobert, is very, very strongly worded.  It's very, very

25   clear.  And even hearing from Mr. Levine, it's clear, that

1  the gist of this agreement is a release from the causes of

2  action against Mr. Levine and his clients.

3        And I want to make sure that when Mr. Watkins is

4  saying that he's not objecting to this motion to approve the

5  compromise, that that's out on the table, because that

6  clearly is the way that this agreement is drafted.

7        THE COURT:  But not for any postpetition actions,

8  right?

9        MR. DELRAHIM:  Correct.

10       THE COURT:  Do I understand that correctly?

11       MR. DELRAHIM:  Yes, Your Honor.  We can only

12  release those claims in which we own.

13       MR. WATKINS:  Correct.

14       THE COURT:  So if there is some cause of action

15  there, that doesn't go away.  Okay, well, let me -- anybody

16  else have any final words?

17       (No response.)

18       THE COURT:  Okay, very well.  The Court has

19  before it a settlement agreement under which Plaintiffs

20  would transfer their ownership interest in certain estate

21  assets to the Debtors -- actually to the Debtors' daughter,

22  I suppose, and other entities.  It also adjudicates the

23  dischargeability of the Plaintiffs' claims and ownership

24  interests in Cygram Heritage and Anna Dunedin Realty.

25       Parc has objected primarily in that the settlement

1    agreement contemplates transfer of estate property -- and

2    it is true that only the Trustee can do that.  And also

3    objects to the value being attributed to the settlement of

4    the potential professional negligence claim against their

5    former attorney, Mr. Adam Levine.

6            The Trustee also objects, at least initially, as

7    to transferring estate assets, which we would all agree is

8    something only the Trustee can do.  The Trustee also objects

9    to releases of the Debtors' former counsel.

10           In response, the Debtors have negotiated with the

11   Trustee a sale of the property needed to consummate the

12   settlement, and that's the subject of a Notice of Intention

13   to Sell.

14           And so it would be necessary for this Court to

15   overrule any objection to the sale or to consummate the

16   settlement.  Settlements in bankruptcy are governed by a

17   case called *Justice Oaks*.  It's an Eleventh Circuit case.

18   And it gives the Trustee and the parties much leeway in

19   terms of effecting a settlement, even if the settlement

20   isn't the best case that could occur so long as, overall,

21   it makes sense to the estate and it's fair and equitable.

22   And it's an outcome that's in the range of the worst

23   that probably would be probable to occur in litigation.

24   Settlements are generally favored because they resolve

25   complex and difficult litigation, often that's been pending

1    for months, if not years.

2          So having considered the *Justice Oaks* factors and

3    presentations of the parties here and in writing, it's my

4    conclusion, heavily relying on the Trustee appearing to

5    favor the sale so long as -- and then in turn the compromise

6    -- that I will overrule any objection to the reported notice

7    of intention to sell, so long as it's clear that the

8    compromise does not affect any postpetition cause of action,

9    and I'll also approve the motion to approve the compromise

10   of controversy.

11         Any final order will have to be done with the

12   Trustee's consent.  I'll ask Mr. Delrahim to work with the

13   Trustee, and then seek the input of other parties as to the

14   form of the order.

15         MR. DELRAHIM:  Thank you, Your Honor.

16         MS. DAMMER:  Your Honor?

17         THE COURT:  Yes.

18         MS. DAMMER:  In our objection, we reserved the

19   right to bid on the assets.  If we could have words to that

20   effect in the order?  I don't know if Your Honor wants to do

21   an auction or how to best effectuate that.

22         THE COURT:  Mr. Delrahim, let me hear about

23   whether you object to that, and then we'll hear from

24   Mr. Watkins.

25         MR. DELRAHIM:  Thank you, Your Honor.  My

1  understanding is that all the parties have received notice,

2  that if Ms. Dammer desired to file -- to put in a bid, it

3  shouldn't cause the Debtors and the Trustee to delay sales,

4  especially because the only purpose would be to cause harm

5  to the Debtors and cause harm to the sale, which would be

6  the result of the bid.

7           THE COURT:  Okay.  Mr. Watkins, what do you say to

8  that?

9           MR. WATKINS:  Well, Your Honor, the Trustee's

10 always looking to get more money for the estate, and I think

11 that in view of today's proceedings, that opening a short

12 window for bids and a telephone auction would be

13 appropriate.

14          THE COURT:  Mr. Delrahim?

15          MR. DELRAHIM:  Thank you, Your Honor.  Your Honor,

16 again, this has been -- we had this notice of sale pending

17 for 21 days at least.  Ms. Dammer has received notice of it.

18 If her client intended to bid, for the purpose of simply

19 blocking this entire sale, then it should have been made

20 known.

21          The Debtors were -- this hearing has already been

22 continued once, so it's been way more than 21 days.  In

23 fact, I think it's been two months now because it was

24 actually continued.  Actually, I'm sorry.  Your Honor, I

25 apologize.  The motion to approve the compromise was

1    accepted so that we could facilitate this sale.  And no

2    offers have been made.

3            The Debtor has -- and I'll just be very candid

4    with the Court and counsel here, is that the Debtors have a

5    foreclosure on their house right now.  And as a part of this

6    settlement agreement, which needs to happen as a result of

7    -- and with the compromise -- as part of the compromise,

8    the mortgage is going to be eliminated, that $1.2 million

9    mortgage would be eliminated and allow the Debtors to

10   actually have some sort of equity in their property so they

11   can either obtain a refinance or that they can sell the

12   property and hopefully buy maybe a smaller house.  But if

13   this just keeps getting punted, Your Honor, you know, the

14   Debtors are at a very strong disadvantage.

15           THE COURT:  Okay.  Mr. Levine?

16           MR. LEVINE:  Your Honor, without the Debtors

17   purchasing the assets necessary for their settlement or the

18   mediated agreement -- so I don't upset Mr. Delrahim -- the

19   mediated agreement is not capable of being fulfilled and we

20   need to just set the adversary proceeding for trial.

21           THE COURT:  Okay.  Ms. Dammer?

22           MS. DAMMER:  Your Honor, we're asking -- we're

23   simply asking for an opportunity to bid.  This is the first

24   time that this notice of sale has been up.  We filed our

25   objection timely.  As soon as we received notice of the

1  Trustee's intent to sell the property, we did file our

2  objection.  Our objection reserves our right to bid.

3        The estate will suffer if we're not allowed to bid

4  because we're obviously going to be bidding more than the

5  $500 and there's other unsecured creditors in this case.

6        MR. DELRAHIM:  Your Honor we can play that game

7  all day long where -- sorry.

8        MR. LEVINE:  Your Honor?

9        THE COURT:  Yes.

10        MR. LEVINE:  I would just like to highlight one --

11  two facts for the Court.  Every single operating agreement

12  for all of the related companies state that any prior

13  existing debts or liabilities to the Talangas remain with

14  the Talangas after the investment of my clients.

15        The second issue is whether there was anything to

16  be gained or whether the asset for Anna Dunedin or Elite

17  Holdings has any -- if there's any money whatsoever.  And

18  the settlement agreement that was signed validly in June of

19  2016 says that all proceeds from the sale of all companies

20  that included Anna Dunedin Realty and anything that had any

21  part for Elite Holdings has to repay a $2 million bank loan

22  with Hancock Bank.  Right now, the liability of $2 million

23  far exceeds any assets of --

24        THE COURT:  Mr. Levine, you're not helping.

25        MR. LEVINE:  Okay.

1          THE COURT:  You may have a seat.

2          Okay, very well, the objecting creditor has raised

3   the issue of whether they should be entitled to bid.  The

4   Trustee, of course, always welcomes more money.  Ordinarily,

5   that would be a request I would readily grant.  But

6   ordinarily sales are simple.  There's a buyer, the seller

7   would be the Trustee on behalf of the estate, and there's a

8   price, and it's fairly straightforward.  One party is going

9   to buy it for a million and someone else says, "Hey, wait a

10  million, the property's worth a million two and I'll bid a

11  million two."

12          This isn't that situation.  This is much more

13  complicated.  And we don't really have an apples to apples

14  situation, which could result in any meaningful bids, so

15  I'm not going to allow any competing bids in the compromise.

16  We either stand or fall under its terms.

17          And based on what I've said earlier, I will

18  approve the compromise as set forth in the motion to approve

19  the compromise, and I'll work with Mr. Delrahim and the

20  other parties on a form of order, okay?

21          MR. DELRAHIM:  Thank you, Your Honor.

22          MS. DAMMER:  Thank you, Your Honor.

23          THE COURT:  Is there anything else that we need to

24  cover today or does that cover the matters on the calendar?

25          MR. DELRAHIM:  That's everything that's on the

1   calendar, Your Honor.  Thank you.

2          THE COURT:  Very well, then.  This hearing is

3   concluded.  Thank you all.

4          (Proceedings adjourned at 11:42 a.m.)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

CERTIFICATE


This certifies that the foregoing constitutes the official verbatim transcript produced to the best degree possible from the FTR digital recording, and/or MP3 backup, and/or telephonic audio recording, as recorded, logged, maintained, and provided by court staff.


Cheryl Culver                          September 10, 2019
_____           _____
Cheryl Culver                          Date
Certified Court Reporter

For Johnson Transcription Service
Approved Court Transcribers for
U.S. Bankruptcy Court
Middle District of Florida